**NOT FOR PUBLICATION**

UNITED STATES COURT OF APPEALS

FOR THE NINTH CIRCUIT

| | |
|---|---|
| ABDUS SAMAD, | No. 16-71752 |
| Petitioner, | Agency No. A208-169-040 |
| v. | |
| MATTHEW G. WHITAKER, Acting Attorney General, | MEMORANDUM* |
| Respondent. | |

On Petition for Review of an Order of the
Board of Immigration Appeals

Argued and Submitted October 11, 2018
Seattle, Washington

Before:  N.R. SMITH and CHRISTEN, Circuit Judges, and PAYNE,** District
Judge.

Abdus Samad petitions for review the decision of the Board of Immigration

Appeals ("BIA") denying his applications for asylum, withholding of removal, and

---

\*        This disposition is not appropriate for publication and is not precedent
except as provided by Ninth Circuit Rule 36-3.

\*\*        The Honorable Robert E. Payne, Senior United States District Judge
for the Eastern District of Virginia, sitting by designation.

protection under the Convention Against Torture. We have jurisdiction under 8 U.S.C. § 1252, and we deny the petition for review.

We review the BIA's "legal conclusions de novo and its factual findings for substantial evidence."[1] *Bringas-Rodriguez v. Sessions*, 850 F.3d 1051, 1059 (9th Cir. 2017) (en banc) (citations omitted). We apply a substantial evidence review of the BIA's denial of asylum, even where, as here, the immigration judge ("IJ") found Samad to be credible. *Nagoulko v. INS*, 333 F.3d 1012, 1015 (9th Cir. 2003). "Substantial evidence is more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Landin-Zavala v. Gonzales*, 488 F.3d 1150, 1151 (9th Cir. 2007) (internal quotation marks omitted) (quoting *Ibarra-Flores v. Gonzales*, 439 F.3d 614, 618 (9th Cir. 2006)). Thus, "[s]ubstantial evidence review means that we may only reverse the agency's determination where 'the evidence compels a contrary conclusion from that adopted by the BIA.'" *Parada v. Sessions*, 902 F.3d 901, 908-09 (9th Cir. 2018) (quoting *Afriyie v. Holder*, 613 F.3d 924, 931 (9th Cir. 2010)).

---

[1] The BIA cited *Matter of Burbano* in its decision. When "the BIA cites *Burbano* and also provides its own review of the evidence and law, we review both the IJ's and the BIA's decisions." *Ali v. Holder*, 637 F.3d 1025, 1028-29 (9th Cir. 2011).

1. To establish eligibility for asylum on the basis of past persecution, Samad "must show: (1) an incident, or incidents, that rise to the level of persecution; (2) that is 'on account of' one of the statutorily-protected grounds; and (3) is committed by the government or forces the government is either 'unable or unwilling' to control." *Navas v. INS*, 217 F.3d 646, 655-56 (9th Cir. 2000) (footnotes omitted). The BIA concluded that Samad's past harm did not rise to the level of persecution and that the harm suffered was not "on account of" a protected ground. Samad does not point to evidence in the record which "compels a contrary conclusion from that adopted by the BIA." *Parada*, 902 F.3d at 909.

A. Substantial evidence supports the BIA's decision that the threats and beating suffered by Samad did not rise to the level of past persecution. *See Hoxha v. Ashcroft*, 319 F.3d 1179, 1182 (9th Cir. 2003) (harassment, threats, and one beating did not compel a finding of past persecution). The BIA noted that Samad "testified that he had one interaction with the Taliban, who came to his house seeking to use his vehicles in an apparent plot to attack a school, and that he was threatened, beaten with the butt of a gun, and suffered bruises." Samad does not assert that the BIA or the IJ made incorrect factual findings, rather he challenges this conclusion, asserting that he suffered past harm, because the Taliban had a "powerful role in the community and [was] renowned for [its] violent fanaticism,"

3

and that he "was persecuted in that he was unable to live a 'complete life' and unable to freely practice his beliefs." These claims, by themselves, are not enough to compel a finding of past persecution. *Cf. INS v. Elias-Zacarias*, 502 U.S. 478, 482 (1992). In an effort to establish past persecution, the dissent manufactures an argument Samad does not make in his opening brief, suggesting that the murder of his employee is included in his claim for past persecution.[2] However, "we cannot manufacture arguments" for Samad and we cannot "consider any claims that were not actually argued" in his opening brief. *See Indep. Towers of Wash. v. Washington*, 350 F.3d 925, 929 (9th Cir. 2003) (internal quotation marks omitted).

Second, even if Samad had raised this fact as a basis for past persecution, we "generally treat[] unfulfilled threats, without more, as within that category of conduct indicative of a danger of future persecution, rather than as past persecution itself." *Lim v. INS*, 224 F.3d 929, 936 (9th Cir. 2000). Although the dissent correctly points out that death threats may constitute persecution, that conclusion does not mean that all death threats *compel* a finding of past persecution. *See Canales-Vargas v. Gonzales*, 441 F.3d 739, 743-46 (9th Cir. 2006) (holding that death threats did not compel a finding of past persecution, but did compel a finding

---

[2] This evidence was cited by Samad only to support his claim that he had a well-founded fear of future persecution.

4

of future persecution). Although we are sympathetic to the harm and threats Samad endured, the circumstances here (especially where he did not assert past persecution in light of the surrounding circumstances) do not compel a contrary conclusion. *See id.* at 743-44 (holding past persecution was not compelled when Shining Path sent threatening notes, made phone calls escalating in severity, and made additional threats to kill her family).

B.  Substantial evidence also supports the BIA's conclusion that Samad failed to establish persecution "on account of" a protected ground. Instead, the BIA concluded that the harm Samad suffered was on account of his refusal to cooperate with the Taliban. Samad challenged this conclusion, asserting that he was persecuted on account of his membership in a particular social group of health and education workers, his religion, and his political opinion. Although Samad presents evidence to support his argument, that evidence does not compel a conclusion contrary to the BIA's decision. *See Elias-Zacarias*, 502 U.S. at 481 (noting the BIA "can be reversed only if the evidence presented . . . was such that a reasonable factfinder would have to conclude that the requisite fear of persecution existed"). The fact that the BIA could have conceivably weighed the evidence differently (as the dissent does) is not a sufficient basis to find that substantial evidence does not support the BIA's conclusion. *Prasad v. INS*, 47 F.3d 336, 340

(9th Cir. 1995) ("Although a reasonable factfinder *could* have found this incident sufficient to establish past persecution, we do not believe that a factfinder would be compelled to do so.").

First, the BIA properly rejected Samad's proposed social groups of health and education workers, because the groups he identified do not share immutable or innate characteristics. *See Reyes v. Lynch*, 842 F.3d 1125, 1131 (9th Cir. 2016). Second, Samad has presented no evidence that the Taliban was aware of his religious beliefs. The fact that Samad ran a business busing school children does not establish that Samad held a known religious belief that children should be educated. Finally, there is no evidence that the Taliban targeted Samad based on an actual or imputed political opinion. To the contrary, Samad testified that he was targeted because the Taliban wanted his buses to blow up a school. In particular, the Taliban wanted his buses, because they knew the school buses were not searched, so they would be able to reach the schools. There is no evidence in this record that Samad expressed an anti-Taliban opinion. Nor is there evidence in the record that Samad was targeted for an anti-Taliban opinion. *See Garcia-Milian v. Holder*, 755 F.3d 1026, 1031-32 (9th Cir. 2014) (holding to establish an imputed political opinion, "the applicant for asylum must present evidence of the persecutor's views" directly through "[a] persecutor's statements attributing

6

political views to the applicant" or indirectly through "the applicant's association with . . . people who are known to hold a particular political opinion"). Notably (supporting the BIA's decision), Samad never testified that he was targeted, because he drove girls and boys to school. Nor was there evidence that the Taliban sought Samad out, because the Taliban thought Samad was promoting education in Pakistan. The mere fact that Samad owned and drove a school bus for children is not sufficient direct or circumstantial evidence that he was targeted "on account of" an anti-Taliban political opinion. *See id.* On substantial evidence review, the fact that the Taliban targeted Pakistani schools to promote its campaign of stifling education, by itself, does not compel a conclusion that Samad was harmed because of his pro-education opinion over the finding that Samad was harmed because he refused to let the Taliban use a vehicle that could further its goals.

2. Substantial evidence supports the BIA's conclusion that Samad failed to meet his burden that he has a well founded fear of future persecution on account of a protected ground. Samad did not assert that he would be persecuted in the future on grounds separate from those already asserted. Therefore, because Samad did not present any evidence that he was targeted in the past on account of a protected ground, he did not meet his burden of establishing future persecution.

7

3.      Because Samad failed to make a prima facie case for asylum, he necessarily failed to meet the higher standard of proof for eligibility for withholding of removal.  *See Barajas-Romero v. Lynch*, 846 F.3d 351, 360 (9th Cir. 2017).

4.      Substantial evidence also supports the BIA's conclusion that Samad has not established that it is more likely than not he will be tortured with the acquiescence of a public official if he is returned to Pakistan.  Although the BIA recognized that Pakistan has "disturbing conditions," it did not find a likelihood of torture, and Samad has not pointed to any evidence in the record that would compel a contrary conclusion.  *See Delgado-Ortiz v. Holder*, 600 F.3d 1148, 1152 (9th Cir. 2010) (per curiam).

**PETITION FOR REVIEW DENIED.**

*Abdus Samad v. Matthew G. Whitaker*, No. 16-71752

CHRISTEN, Circuit Judge, concurring in part and dissenting in part:

I agree that substantial evidence supports the BIA's denial of petitioner Abdus Samad's claim under the Convention Against Torture, but I do not agree that substantial evidence supports the BIA's denial of his other claims. Because the record compels the conclusion that Samad fled in response to harm that rose to the level of persecution, made on account of his imputed political opinion, I respectfully dissent.

Samad, a school bus driver for young Pakistani children, fled his country in late October of 2014. An immigration officer and an immigration judge both found Samad to be credible when he testified that, in August of 2014, members of the Taliban demanded use of his school buses so they could carry out a plan to blow up a public school. First, Taliban members demanded that Samad's employee turn over the buses. They threatened the employee and beat him so that he "was bleeding all over." The employee told the Taliban that his boss owned the buses, so they "came after [Samad]." Armed Taliban members went to Samad's home, demanded that he turn over the buses, beat him with the ends of their guns, threatened to kill him, and also threatened his family.

Samad did not relinquish the buses. Instead, he and his employee reported the terrorist plot to school authorities the following day. The school was closed for

a short time, and the police arrested one of the Taliban's leaders. Samad and his employee resumed driving the children to school when the school reopened, but the Taliban leader the authorities had arrested in response to Samad's report was killed while in custody. A few weeks after that, the Taliban murdered Samad's employee. The employee was "getting the bus ready, fueling gas into the bus to take the kids" when the Taliban "bombarded" him. He was shot 12 times.

Samad fled. He went into hiding for two months until he was able to find an agent to help him get out of Pakistan. Then, on October 30, 2014, Samad flew from Islamabad to Brazil. From there he traveled by bus, taxi, boat, and on foot across Peru, Ecuador, Columbia, Panama, Costa Rica, Nicaragua, Honduras, Guatemala, and Mexico. Samad arrived alone at the United States border in Brownsville, Texas on May 26, 2015. He presented himself at the border, recounted his story, and requested asylum. It was there that an asylum officer determined that Samad demonstrated a credible fear of persecution or torture. Later, an immigration judge agreed that he was credible, but denied Samad's request for asylum. The immigration judge concluded "no evidence in the record" demonstrated that Samad suffered persecution based upon religious or political beliefs that either the Taliban knew or should have known about. The Board of Immigration Appeals affirmed the decision to deny asylum, ruling that Samad

2

failed to demonstrate both past persecution and nexus.  These rulings are not supported by the record.

As background, the Taliban's demand for Samad's buses was just one episode in the group's ongoing campaign to stifle education, particularly girls' education, in Pakistan.  It is no secret that the Taliban has bombed hundreds of schools and killed proponents of female education, and there is ample evidence corroborating Samad's testimony regarding the nature of the Taliban's campaign. The U.S. Department of State's *Country Reports on Human Rights Practices for 2014* confirms that the Taliban targeted Pakistani schools "with bombs, suicide attacks, and other forms of violence," and that, in addition to "destroy[ing] boys' schools," it "targeted girls' schools to demonstrate its opposition to girls' education."  Bureau of Democracy, Human Rights & Labor, U.S. Dep't of State, *Country Reports on Human Rights Practices for 2014: Pakistan*, at 32.  Another study in the record is in accord: between 2009 to 2012, the Taliban was primarily responsible for *at least 838 attacks* on schools in Pakistan.  Global Coalition to Protect Educ. from Attack, Education Under Attack 2014, 131, 149 (2013), *available at* http://protectingeducation.org/sites/default/files/documents/eua_2014_country_pro files_pakistan.pdf.  These attacks were "more than in any other country, leaving

3

hundreds of schools destroyed." *Id*. at 149. Samad's statement to an asylum officer—that his refusal to hand over the buses signified to the Taliban that "it was a movement against their movement"—succinctly summarizes the Taliban's motivation for persecuting Samad. Preventing education, and particularly girls' education, has been "one of [the Taliban's] objectives" for years. *Id*. at 150. In fact, the reason the Taliban needed Samad's buses in the first place was that its attacks on schools had become so common that there was "security at the school," preventing access. As Samad explained, "the buses that were going through would not be searched." It cannot be doubted that the Taliban's brutal campaign continued to rage at the time Samad's employee was murdered. Just months after the Taliban demanded Samad's school buses, it carried out the deadliest terrorist attack on a public school in Pakistan's history, killing 142 and injuring at least 250 individuals—most of them children— in the very same province where Samad lived and worked. *Country Reports on Human Rights Practices for 2014: Pakistan*, at 33.

The majority concludes that substantial evidence supports the BIA's decision that the death threats and beating Samad endured did not rise to the level of past persecution. It also decides that substantial evidence supports the BIA's ruling that Samad failed to establish a nexus between his imputed political opinion

and the Taliban's death threats. Maj. at 3–7. On both scores, the record compels a contrary conclusion.

In *Khup v. Ashcroft*, we concluded that past persecution was compelled where, after "only one serious run-in with the Burmese military," a petitioner and his fellow preacher defied the military's orders not to preach, the military subsequently arrested, tortured, and killed the preacher, and the petitioner "was forced to go into hiding and flee from village to village before escaping the country." 376 F.3d 898, 903 (9th Cir. 2004). On that record, we concluded that "a reasonable fact-finder would be compelled to conclude that [the petitioner] was a refugee fleeing persecution." *Id.* Our court has "'consistently held that death threats alone can constitute persecution.'" *Canales-Vargas v. Gonzales*, 441 F.3d 739, 743 (9th Cir. 2006) (quoting *Navas v. INS*, 217 F.3d 646, 658 (9th Cir. 2000)); *Mashiri v. Ashcroft*, 383 F.3d 1112, 1119 (9th Cir. 2004) (observing that we have "repeatedly held" that threats may be "compelling evidence of past persecution," particularly threats that are specific and menacing and are accompanied by "violent confrontations"). Here, the Taliban's violence unequivocally constituted persecution and compels a finding of past persecution. After Taliban members unsuccessfully demanded that Samad's employee give them the buses, they tracked down Samad, beat him with the ends of their guns,

5

and threatened to kill him. Samad refused to cooperate, openly defied their demands, and continued to drive the children to school. The Taliban killed his employee in short order. The Taliban's death threats were not idle, and our case law does not require Samad to wait for the terrorist group to return to kill him too.

The majority concludes that Samad did not assert past persecution in light of the surrounding circumstances, but his brief cannot be read any other way. Samad argues that the Taliban is renowned for their "violent fanaticism," and that the "cumulative effect" of his encounters amounted to past persecution. His counsel argued to the immigration judge that Samad's testimony about his decision to drive a school bus demonstrated that "he's . . . expressed an opinion that appears to run counter to the Taliban's political opinion," and Samad told an asylum officer that the Taliban understood his actions to be in opposition to their movement. The majority ignores clear record evidence in support of this claim. *Cf. Indep. Towers of Washington v. Washington*, 350 F.3d 925, 929 (9th Cir. 2003) (observing that we do not "manufacture arguments" when an appellant, "instead of making legal arguments . . . provides a five page laundry list of the challenged regulations and their titles, leaving the court to piece together the argument[s]," and noting that a "bare assertion of an issue does not preserve a claim."). Samad testified at length before the immigration judge about the Taliban's death threats that culminated in

6

his employee's death, and that he was threatened, physically attacked and beaten. Samad's brief "may not be perfectly written, but it is not difficult to discern the point [he] is trying to make," and we have never condoned ignoring objective evidence demonstrating past persecution by "parsing [a petitioner's] brief's language in a hyper technical manner." *Mamouzian v. Ashcroft*, 390 F.3d 1129, 1136 (9th Cir. 2004). "Just as deportation statutes must be construed in favor of the alien . . . the briefs of aliens seeking refugee status must be reviewed with lenity and any ambiguities must be resolved in their favor." *Id.* (citations omitted). The record powerfully supports Samad's claim, and we are obligated to address it in light of the record as a whole.

The majority cites *Hoxha v. Ashcroft*, 319 F.3d 1179 (9th Cir. 2003) for the proposition that Samad failed to demonstrate past persecution, but the facts in *Hoxha* were very different. There, "[t]he one incident of physical violence [against the petitioner] was not connected with any particular threat[,]" and there was "no evidence that the attackers knew who [the petitioner] was or that they showed any continuing interest in him[.]" *Id.* at 1182. *Hoxha* merely observed that "unfulfilled threats . . . constitute harassment rather than persecution." *Id.* The threats in Samad's case did not go unfulfilled. *Cf. Canales-Vargas*, 441 F.3d 739 at 744 (noting the Shining Path never confronted petitioner nor physically harmed

7

her, and that she received threats "that were never carried out"); *Lim v. INS*, 224 F.3d 929, 936 (9th Cir. 2000) (observing that neither petitioner nor his family were "ever touched, robbed, imprisoned, forcibly recruited, detained, interrogated, trespassed upon, or even closely confronted"). The uncontested facts supporting Samad's petition for asylum compellingly illustrate that Samad and his employee were beaten, and the employee was murdered soon after, because they thwarted the Taliban's political objective to blow up a school.

The majority affirms the immigration court's nexus ruling, concluding that Samad never established that he expressed an anti-Taliban opinion, or that he was targeted for an anti-Taliban opinion. Maj. at 6–7. Again, the majority is mistaken. Samad need not have told his persecutors why he refused to hand over the buses. He told an asylum officer that the Taliban understood that his actions were "a movement against their movement – that pretty much I was telling them that what they were doing is un-Islamic while they think they are very Islamic." *See Canas-Segovia v. INS*, 970 F.2d 599, 601 (9th Cir. 1992) (observing that "[i]mputed political opinion is still a valid basis for relief after *Elias-Zacarias*," and declining to require a petitioner to tell his persecutor the cause of his resistance). The majority overlooks that when we determine whether an applicant has been persecuted because of an imputed political opinion, our inquiry "'turns

8

away from the views of the victim to the views of the persecutor[,]'" and we consider "'the political views the persecutor rightly or in error *attributes to his victims.*'" *Agbuya v. INS*, 241 F.3d 1224, 1229 (9th Cir. 2001) (quoting *Sangha*, 103 F.3d at 1487) (emphasis added). The Taliban correctly understood that Samad stood in the way of their political objective of blowing up a school, thereby furthering their political goals.

The court's conclusion that the "mere fact that Samad owned and drove a school bus for children is not sufficient direct or circumstantial evidence that he was targeted 'on account of' an anti-Taliban political opinion," Maj. at 7, fails to acknowledge the affirmative actions Samad took to thwart the Taliban's terrorist plot *and* the close temporal connection between Samad's actions and the Taliban's response. The beatings, death threats, and killing of Samad's employee all occurred in the span of one month, making plain that this persecution was the Taliban's response to Samad's active resistance to its political agenda. The Taliban's efforts to stifle education, in this case by demanding the use of Samad's buses to bomb a school, cannot be analytically separated from Samad's persistent efforts to drive young children to school, nor from his refusal to cooperate with the Taliban's mission.

In my view, any reasonable factfinder would be compelled to conclude that the Taliban members took revenge because Samad: (1) was driving young children to school; (2) refused to accede to their demands; (3) reported their plot, thereby thwarting it; and (4) resumed driving children to school after it reopened. *See Agbuya*, 241 F.3d at 1229–30 (observing that the context of the communist guerilla insurgency in the Phillippines coupled with petitioner's actions required a reasonable factfinder "to conclude that the communist [guerilla group] interpreted [petitioner's] actions as an affront to their cause[.]").

The record vividly illustrates that the Taliban understood Samad's opposition to their goals. They beat him, threatened his family and Samad's life, and killed his employee on account of Samad's refusal to cooperate with their plan and resolve to continue driving girls and boys to school. Because this record compels the conclusion that Samad's imputed political opinion was at least one central reason for his persecution, I respectfully dissent.

10